In the Matter of Peter J. HAYES, Jr., Debtor.

Bankruptcy No. MM7–81–00003.

United States Bankruptcy Court, W. D. Wisconsin.

May 28, 1982.

William Chatterton, Ross & Chatterton, Madison, Wis., for Kenneth Cummings.

Robert Brill, Aulik & Brill, S. C., Sun Prairie, Wis., for Production Credit Ass'n.

Jerry Armstrong, Madison, Wis., trustee.

## OPINION AND ORDER

ROBERT D. MARTIN, Bankruptcy Judge.

In 1980 debtor Peter J. Hayes and claimant Kenneth Cummings, entered into an oral agreement to farm jointly. Under the agreement, Hayes was to move his herd of approximately 60 cows onto Cummings' farm, where they were to be cared for with Cummings' herd of 40 cows. Hayes was to pay 40 percent of the farm expenses and receive 40 percent of the milk check. The labor was to be divided with Hayes acting as the herdsman, and Cummings doing the field work. Hayes was to own 40 percent of the crops, feed and supplies grown on the farm. The agreement was at one time reduced to writing, but was never signed, because the two men were unable to work out all of the details. Hayes moved his cattle onto Cummings' land in April. At that time, Production Credit Association of Madison (PCA) held a security interest in the Hayes cattle and in his portion of the milk check.

In 1980, Hayes contributed $2,500.00 towards the expense of running the farm. This amount fell $11,600.00 short of his actual share of the expenses paid by Cummings.

At the end of 1980, the agreement between Hayes and Cummings was changed. Under the new agreement, the expenses were to be shared equally. The 60–40 split on the milk check was retained as were all other details of the agreement.

On January 5, 1981, Hayes filed a petition in bankruptcy. Cummings, Hayes and PCA, the holder of the security interest in Hayes' cattle, worked out a trial agreement under which PCA would deduct only interest from Hayes' share of the milk check, refunding the balance for operating expenses. This agreement was to last six months, provided that the size of the herd was maintained, and further provided that the parties agreed on and signed a written contract.

Only two milk checks were refunded under the new agreement. On March 20, 1981, PCA refunded the entire dairy check of $2,000.00 and on April 22, $1,500.00 was refunded. Tom Zwettler, a branch manager of PCA, testified that no other refunds were made because Hayes and Cummings failed to sign a written agreement. Hayes remained on Cummings' farm providing labor until June 15, 1981, when he left because he and Cummings could not get along. Between June 15 and July 3, the entire milk check of $2,228.67 was paid to Cummings.

On July 3, 1981, Hayes' cattle were sold at an auction on the Cummings farm for a net sum of $58,006.20. Of this $58,006.20, $4,564.19 was paid to Farm Loan Service to satisfy its security interest and $43,442.01 was paid to PCA in partial payment of its secured claim. The balance due PCA was $7,606.92. Before the auction, Cummings told PCA that he would not allow the sale to proceed until he had been reimbursed for his expenses in caring for the cattle from the date of the bankruptcy petition. PCA agreed to escrow $10,000.00 of the sale proceeds, pending a determination of Cummings' right to receive payment. Zwettler and the trustee in bankruptcy both testified that they received no notification that Cummings intended to seek reimbursement for his expenses in caring for the cattle, prior to making arrangements for the sale.

On August 28, 1981, Cummings filed an application for administrative expenses, claiming that he had incurred expenses of $25,047.47 in caring for the cattle, and requesting that he be paid the funds held in escrow ($10,000.00). At a hearing on objection to that claim, Cummings testified that his actual expenses in caring for the cattle, from the date of bankruptcy until the auction, were $25,047.47. The expenses incurred were demonstrated in two ways. First, Cummings established that the average cost for feeding and caring for dairy cattle was determined by the University of Wisconsin School of Agriculture to be

$126.33 per day for 59 cows and $13.60 per day for 20 heifers. Thus, the total estimated cost of caring for Hayes' herd over six months is $25,047.47. This figure was stipulated to be an accurate estimate, but was not stipulated to be the amount actually spent.

Cummings also provided evidence of actual expenses. For some he was able to produce bills paid and cancelled checks. These bills included:

1. Power and electricity;
2. telephone;
3. veterinary bills;
4. supplies; and
5. machinery repair.

These expenses totalled $13,095.40. Cummings claims one-half this amount, $6,547.70, as allocated to the Hayes cattle.

Cummings demonstrated other expenses, feed, labor and depreciation by indirect means. No inventory was taken at the beginning of 1981 of the feed that was grown on the farm so it is impossible to measure the amount of feed the cattle actually consumed. Duane Hanusa, an employee of Sauk County Farmers Cooperative Supply Company, testified that there is a close relationship between milk production and the amount and type of feed consumed. Based on records of the milk produced by the Hayes-Cummings herd, he estimated the feed consumed to be 20 lbs. of grain, 13 lbs. of haylage, 13 lbs. of silage, and 3.5 lbs. of protein per cow and 14 lbs. of corn silage and 14 lbs. of haylage per heifer per day. Multiplying these amounts by the then current prices indicates a feed requirement of $2.16 per head per day for the cows and $.69 per head per day for the heifers. The total estimated feed costs for the Hayes herd of 59 dairy cows and 20 heifers over a period of 182 days would be $25,625.60. The charge for the protein supplement of $7,343.70 was also included in the bills paid by check and must, therefore, be deducted to determine the total feed cost of $18,281.90.

Cummings also produced a depreciation schedule which shows the amount of depreciation he planned to claim for tax purposes on the dairy buildings and equipment. The total depreciation is $7,614.00. Cummings has made a claim for one-half of the total depreciation or $3,907.00, even though Hayes' cattle were using his buildings and equipment for only half the year. Cummings admitted that the presence of debtor's cattle did not affect the amount of depreciation he planned to claim.

The labor charge is the last item which required estimation. Cummings testified that he put in 50 hours a week caring for the entire herd of cattle, while his sons worked 10 hours a week over the 26-week period. Cummings testified that a hired laborer would be paid $5.00 an hour for his labor. Cummings is thus claiming one-half of 60 × $5 × 26 or $3,900.00 for his labor.

To recapitulate, Cummings claims to have proved the following expenses in caring for debtor's cattle:

1. $6,547.70 in out-of-pocket expenses;
2. $18,281.90 in estimated feed costs;
3. $3,907.00 in depreciation; and
4. $3,900.00 in labor.

The total expense claimed under this method of calculation is $32,636.60. The amount claimed for depreciation should be halved. If Cummings is entitled to reimbursement for depreciation at all, it can only be for that period of time which the Hayes cattle were on his farm. Thus, the total expenses should be reduced by $1,935.35 to $30,701.25.

From this amount, Cummings conceded that $3,500.00, the amount refunded from the milk checks by PCA, should be deducted, as should the milk receipts from June 15 to July 3, in the amount of $2,228.67. This leaves a claim of $24,972.58. Although it has been suggested that Hayes owned $11,600.00 of the feed fed to the cattle under his agreement with Cummings it appears that by mutual consent an accord and satisfaction was reached whereby Hayes' 1980 obligation to Cummings was relieved by Cummings retaining title to that feed.[1]

---

1. Although not claimed as such, this accord and satisfaction could properly be viewed as a setoff condoned by 11 U.S.C. § 553.

The questions which remain for the court are:

1. Is Cummings entitled to an administrative priority?

2. If so, how much is he entitled to recover?

Cummings has made a request that his expenses in caring for the debtor's cattle be treated as an administrative expense under 11 U.S.C. § 503, which would be entitled to priority under 11 U.S.C. § 507(a)(1).[2] These sections provide:

§ 503. *Allowance of administrative expenses.*

(a) An entity may file a request for payment of an administrative expense.

(b) After notice and a hearing, there shall be allowed, administrative expenses, other than claims allowed under section 502(f) of this title, including—

(1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case.

§ 507. *Priorities.*

(a) The following expenses and claim have priority in the following order:

(1) First, administrative expenses allowed under section 503(b) of this title, and any fees and charges assessed against the estate under chapter 123 of title 28.

Courts which have considered the issue of priority of administrative expenses under these two sections have found that when expenses are incurred without the authorization or approval of the trustee, the expenditures must meet the following criteria: (1) they must be actual expenses (2) they must be necessary expenses and (3) the creditor must have undertaken the expenses in order to benefit the estate as a whole, not to further his own self-interest. *In Re Eclipse*, No. MM11-80-00980 (Bkrtcy.W.D. Wis. Sept. 29, 1981), *In Re Professional Machinery, Ltd.*, No. 81-00953 (Bkrtcy.E.D. Wis. May 14, 1982), *In Re McK, Ltd.*, 14 B.R. 518, Bankr.L.Rep. (CCH) ¶ 68,360 (Bkrtcy.D.Colo.1981), *In Re Supreme Plastics, Inc.*, 8 B.R. 730 (N.D.Ill.1980), *In Re Meyer's Inc.*, 15 B.R. 390 (Bkrtcy.S.D.Cal. 1981). These cases all deal with situations where a creditor of the estate is claiming an administrative priority. In the instant case, Cummings is not listed as a creditor on the debtor's schedules and does not appear to be owed any money. However, the purpose behind these criteria, to prevent depletion of the debtor's estate, seems equally applicable where the claimant is not a creditor.

The first requirement, that the expenses be actual, seems to have been met by some of the expenses claimed by Cummings, but not all. Depreciation, for example, is not an actual expense incurred by Cummings because of the presence of the Hayes cattle. Cummings admitted on the stand that the amount of depreciation he planned to claim on his income tax was not affected by the presence of the Hayes cattle. Cummings did not actually incur any out-of-pocket expenses in providing the labor necessary to care for Hayes' cattle, nor did he have any agreement setting the rate at which such labor was to be provided. All of the labor was provided by him and his family. Thus, any claim for administrative expenses must be reduced by the $3,907.00 claimed depreciation and by $3,900.00 of labor charges.

The second requirement is that the expenses incurred be necessary to the preservation of the estate. In its brief, PCA argued that Cummings' actions in caring for the cattle were not necessary because had he stopped caring for them, the trustee or PCA would have simply sold the cattle. There is no evidence that the delay in selling the cattle, made possible by Cummings' care of the cattle was beneficial to the estate.[3]

---

**2.** Cummings' memorandum of law refers to 11 U.S.C. § 506(c) as the basis for his claim. This section is clearly inapplicable as it provides only for recovery by the trustee or debtor-in-possession. *See* 3 Collier on Bankruptcy ¶ 506.06 (15th ed. 1981).

**3.** Indeed there was evidence at trial that the value of the cattle actually decreased during the 6-month period Cummings cared for them due to market fluctuations.

In cases where courts have found expenses to be necessary to the preservation of the estate, the expense incurred was one which had to be incurred by some party.[4] In *In Re McK, Ltd., infra*, for example, the court found that hazard insurance on real property is necessary to preserve its value.[5]

In the instant case, the issue is less clear cut. The value of the cattle would have decreased dramatically if no one had fed, milked, and sheltered them. However, had Cummings stopped caring for the cattle and advised the trustee or PCA,[6] little of what he spent would probably have been incurred by the trustee or the estate, as the cattle would have been sold much earlier. The question of whether a party is entitled to an administrative priority for expenses which, without his intervention might not have been incurred at all but were clearly necessary if the asset were retained by the estate, is one on which I have been able to find no guidance. It seems inequitable that one creditor should be forced to bear the burden of preserving an asset. On the other hand, courts have a justified concern that the bankruptcy estate not be depleted by unnecessarily incurred expenses. *See In Re Supreme Plastics, Inc., infra, In Re McK, Ltd., infra.* To the extent that the estate is benefitted by a surplus in value of the cows over PCA's security interest, Cummings' efforts and expenses did contribute to preserving that benefit after the trustee opted to delay sale. Thus, the trustee's choice in permitting the cattle to remain in Cummings' possession made the expenses incurred in this case necessary.

The last question to be decided is whether Cummings undertook to care for the cattle in order to benefit the estate or to further his own interests. Courts have described this requirement as designed to insure that unsecured creditors are not forced to bear the burden of the expenses incurred by a creditor acting in his own interest. In *In Re Supreme Plastics, Inc., infra*, for example, the District Court upheld a Bankruptcy Court decision that a creditor could not claim the entire rent he had paid on behalf of the debtor as an administrative expense. The court found that the creditor had acted primarily to protect his security interest in the debtor's property stored on the rental property and was not entitled to be fully reimbursed. In *In Re McK, Ltd., infra*, the creditor requested to be reimbursed for expenses in procuring insurance. The court held that because the creditor had a security interest in the property insured almost equal to the value of the property, the creditor acted in his own interest in obtaining the insurance.

In the instant case, although his motivation was no doubt complex, it seems that Cummings was acting substantially in his own interest. Cummings continued to care for the cattle under an arrangement with PCA which provided that he was to be compensated out of the milk checks assigned to PCA. Even though the trustee may have implied a direction to care for the cows by his failure to initiate any action to remove them, Cummings, by failing to seek or obtain reasonable assurances of payment or specific authorization from the trustee, assumed the risk of nonpayment. Cummings was primarily motivated to care for the cattle because he wished to receive the milk checks, not because he wished to benefit the estate. Thus, although in one sense the expenses were made necessary to the estate, they were not incurred for the estate's benefit. Cummings may have a claim against PCA because they stopped sending him milk checks, but this does not mean that he should be accorded an administrative priority.

---

**4.** *In Re Hawaii Mini-Storage Systems, Inc.*, 2 C.B.C.2d 151 (Bkrtcy.D.Hawaii 1980), *In Re Standard Furniture Company*, 3 B.R. 527, 6 B.C.D. 270, 2 C.B.C.2d 274, Bankr.L.Rep. ¶ 67,-573 (Bkrtcy.S.D.Cal.1980), *In Re Kors, Inc.*, 13 B.R. 683, 5 C.B.C.2d 872 (Bkrtcy.D.Vt.1981).

**5.** Recovery was denied in *McK* because the creditor was found to be acting in his own interest, not to benefit the estate.

**6.** Both humane standards of conduct and Wis. Stat. § 948.13–15 would preclude the termination of the care of animals without minimal notification to interested parties.

Even if Cummings were entitled to some recovery from the estate as a priority claim, payment would be limited to any assets available for distribution to the general creditors after all secured creditors are paid to the value of their security. As the court in *In Re Parker*, 15 B.R. 980, 982, 8 B.C.D. 688, 689, 5 C.B.C.2d 913, 915, Bankr. L.Rep. ¶ 68,511 (Bkrtcy.E.D.Tenn.1981) explained, "[a] priority claim is one that is entitled to payment ahead of other 'general' unsecured claims." A priority claim, in other words, does not entitle the holder to deprive a secured party of the proceeds from the sale of the security unless they exceed the debt secured. Thus, in the instant case Cummings would only be entitled to that part of the $10,000.00 escrowed which exceeds PCA's remaining secured debt of $7,606.92 or $2,493.08. There appears to be no other assets for distribution to unsecured creditors so Cummings, if he had been allowed an administrative priority, would have only been entitled to recover a portion of the $2,493.08 estate administered by the trustee.

Upon the foregoing which constitute my findings of fact and conclusions of law the claim of Cummings for priority afforded expenses of administration is denied.